# 24-688

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
### *for the*
## 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

Marian E. Parker,

*Plaintiff-Appellant,*

v.

Israel Discount Bank of New York, Inc.,
*Defendant-Appellee*,

and John Does (1-10)
*Defendant*.

**From a Judgment entered by the United States District Court
for the Southern District of New York**

## Brief of Plaintiff-Appellant
## and Special Appendix

Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561

(845) 469-1277
Counsel for Plaintiff-Appellant

**Table of Contents**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       1. The Bank hires Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       2. Plaintiff's job responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       3. Plaintiff's hand injury and accommodation requests . . . . . . . . . . . . . . . . 6

       4. Plaintiff works with Darko on the Work Plan and other tasks . . . . . . . . . 9

       5. Defendant terminates Plaintiff's employment . . . . . . . . . . . . . . . . . . . . . 10

The Decision Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Questions Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The district court improperly granted summary judgment on
Parker's disability discrimination claims brought
under the ADA and the State and City Human Rights Laws . . . . . . . . . . . . . . . . 16

Point I:   Plaintiff has a qualifying disability under the disability laws . . . . . . . . 17

Point II:  The jury may find that Defendant terminated Plaintiff's
               employment because of her qualifying disability . . . . . . . . . . . . . . . . . 25

        A. Plaintiff makes out a *prima facie* case . . . . . . . . . . . . . . . . . . . . . . . 25

B. The jury may link Parker's disability with Defendant's
decision to terminate her employment . . . . . . . . . . . . . . . . . . . . . . . . . 26

C. The jury may find that Defendant's articulated reason
for Plaintiff's termination was a pretext for discrimination . . . . . . . . . 34

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Certification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Special Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# Table of Authorities

## Cases

Arazi v. Cohen Bros. Realty Corp.,
  No. 20-CV-8837-GHW, 2022 WL 912940 (S.D.N.Y. Mar. 28, 2022) . . . . 25

Bart v. Golub Corp.,
  96 F.4th 566 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Bartlett v. N.Y. State Bd. of Law Examiners,
  226 F.3d 69, 83 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Bennett v. Health Mgt. Systems, Inc.,
  92 A.D.3d 29 (1st Dept. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

Bey v. City of New York,
  437 F. Supp. 3d 222 (E.D.N.Y. 2020) . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Brady v. Wal-Mart Stores, Inc.,
  531 F.3d 127 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Bragdon v. Abbott,
  524 U.S. 624 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Byrnie v. Town of Cromwell Bd. of Educ.,
  243 F.3d 93 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Cameron v. City of New York,
  598 F.3d 50 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Capobianco v. New York,
  422 F.3d 47 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Carlton v. Mystic Transp. Inc.,
  202 F.3d 129 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

iii

Chambers v. TRM Copy Centers Corp,
    43 F.3d 29 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Clark v. Stop & Shop Supermarket Co.,
    15-CV-0304 (JCH), 2016 WL 4408983 (D. Conn. Aug. 16, 2016) . . . . . . 18

Cronin v. Aetna Life Ins. Co.,
    46 F.3d 196 (2d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Dipinto v. Westchester Co.,
    18-CV-793 (KMK), 2019 WL 4142493 (S.D.N.Y. Aug. 30, 2019) . . . . . . 19

Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities,
    115 F.3d 116 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fisher v. Vassar College,
    114 F.3d 1332 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fox v. Wholesale Corp.,
    918 F.3d 65 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Greenbaum v. New York City Transit Auth.,
    2022 WL 3347893 (2d Cir. Aug. 15, 2022). . . . . . . . . . . . . . . . . . . . . . . . 20

Hamilton v. Westchester Cnty.,
    3 F.4th 86 (2d Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

Henry v. Wyeth Pharms., Inc.,
    616 F.3d 134 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Jacobson v. New York City Health & Hosp. Corp.,
    22 N.Y.3d 824 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

iv

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kia Song Tang v. Glocap Search LLC,
    No. 14-CV-1108 (JMF), 2015 WL 1344788 (S.D.N.Y. Mar. 24, 2015) . . . 39

King v. Aramark Servs. Inc.,
    96 F.4th 546 (2d Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Klein v. Long Beach City Sch. Dist.,
    No. 04 CV 526 (SLT) (ETB), 2009 WL 10708483
    (E.D.N.Y. June 30, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Levine v. Smithtown Cent. School Dist.,
    565 F. Supp. 2d 407 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 24. 25

Leibowitz v. Cornell Univ.,
    584 F.3d 487 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

McBride v. BIC Consumer Prods. Mfg. Co.,
    583 F.3d 92 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

McGuinness v. Lincoln Hall,
    263 F.3d 49 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42

Memnon v. Clifford Chance US, LLP,
    667 F. Supp. 2d 334 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Morse v. JetBlue Airways Corp.,
    941 F. Supp. 2d 274 (E.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 34

Owens v. New York City Hous. Auth.,
    934 F.2d 405 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

v

Parada v. Banco Indus. De Venez.,
    753 F.3d 62 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Philbrook v. Ansonia Bd. of Educ.,
    757 F.2d 476 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rasmy v. Marriott Int'l, Inc.,
    952 F.3d 379 (2d Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Reeves v. Sanderson Plumbing Prods., Inc.,
    530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Ruiz v. Cnty. of Rockland,
    609 F.3d 486 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Simmons v. New York City Transit Auth.,
    340 F. App'x 24 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Sorlucco v. New York City Police Dep't,
    971 F.2d 864 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Spinelli v. City of New York, Law Dep't,
    No. 13-CV-07112 (GBD) (SN), 2016 WL 11482071
    (S.D.N.Y. Aug. 30, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Weiss v. JP Morgan Chase & Co.,
    332 F. Appx. 659 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Zann Kwan v. Andalex Grp. LLC,
    737 F.3d 834 (2d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

**Statutes**

42 U.S.C. § 12102(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

42 U.S.C. § 12102(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

vi

N.Y.C. Admin. Code § 8-102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Regulations**

28 C.F.R. § 35.108(d)(1)(i)(vi) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

29 C.F.R. § 1630.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 21, 42

## Jurisdiction

As Plaintiff-Appellant Marian E. Parker brought this action pursuant to the Americans with Disabilities Act, the district court had subject matter jurisdiction over the case. As the district court granted summary judgment on all claims and entered a final judgment (JA 553), this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## Statement of the Case

Plaintiff-Appellant Marian E. Parker brought this action under the federal, state and city anti-discrimination laws asserting *inter alia* that she was terminated from her position as Vice President and Technology Risk Officer because of her disability, a slow-to-heal and also permanently disfiguring hand injury, which required her to wear a finger splint and joint stretch devices that required accommodations from her employer, Defendant-Appellee Israel Discount Bank of New York, Inc. ("IDB"). While Defendant claimed Parker was terminated because of her job performance, Parker argued that the real reason was her disability and request for accommodations. Following discovery, District Judge Valerie E. Caproni granted Defendant's motion for summary judgment on all claims, dismissing the Complaint. The district court's ruling is reported at 2024 WL 455220 (S.D.N.Y. Feb. 6, 2024).

1

## Statement of Facts

**1. The Bank hires Plaintiff.**

Marian E. Parker has more than 30 years of experience in the Information Technology (IT) Field. (JA 169 ¶¶ 2-6). She holds two Bachelor's degrees from Southern Methodist University and a Master of Science in Technology Management from Columbia University. (JA 191/53-54; JA 192/59). From 2004 to 2018, prior to joining IDB, Parker worked as an IT Risk consultant for major financial institutions such as Capital One, Citibank, and Morgan Stanley. (JA 169 ¶¶ 3-4).

Parker applied for a position at IDB in October 2018. (JA 438 ¶ 9). She was interviewed by Chief Information Security Officer ("CISO") Ahsan Sheikh, Technology Information Security Officer Theodore Darko ("TISO"), and Head of IT Risk Alex Dalay. (JA 225/190). During the interview process, Bank officials (Sheikh, Darko, and Dalay) told Parker that IDB had implemented a Governance, Risk and Compliance ("GRC") platform that would be ready for her to use. (JA 234/227-28). Parker, however, discovered soon after her commencing employment on December 3, 2018, that IDB never had a GRC platform available for use. (JA 235/231-33). On October 30, 2018, Sheikh offered Parker the position of Vice President and Technology Risk Officer. (Sealed JA 190). Sheikh testified that Parker "was a better fit" than other candidates and had "solid experience in technology [and] in information security" and "an understanding of the banking

environment." (JA 276/32-33; JA 309/162-63).

### 2. Plaintiff's job responsibilities.

Parker's department consisted of CISO Sheikh, her supervisor; TISO Darko, and Technology Information Security Officer Vipul Raval. (Sealed JA 197). Raval and Darko functioned as two information security engineers under CISO Sheikh. Parker, who is not an security engineer, worked as the sole information security risk officer under CISO Sheikh. Parker's duties included working with Darko to update the Information Security Work Plan ("IS Work Plan" or "Work Plan"), which provided a roadmap for the Bank's information security domains, functions and included security audit findings, bank security goals, cybersecurity vulnerabilities, and federal and state compliance requirements. (JA 126-27 ¶¶ 25, 27).

On December 28, 2018, a few weeks after Parker began working for the Bank, Sheikh revised and updated the job descriptions for his three direct reports, Darko, Raval and Parker. (JA 231/213). Sheikh sent these job description emails to his three employees at the same time as normal part of the year-end email communication. At this time, in addition to advising Parker about her updated key job responsibilities (JA 88), Sheikh said he would transfer work from Darko to Plaintiff "effective January 2019." (JA 88); *see also* JA 284/62-63. Sheikh told Plaintiff that Work Plan reporting should be finalized, approved, and sent "to all key stake holders of ISSC at least one week prior to the ISSC meeting." (JA 90). Sheikh also asked Darko to assist Parker

3

with these responsibilities for two months, through the end of February 2019. (Sealed JA 75-78). Parker was therefore not exclusively responsible for IS Work Plan preparation and presentation. At the time of her termination in early February 2019, Darko had not fully transitioned responsibility for the IS Work Plan to Parker, and he did not expect Parker (as a new employee), to "know everything" about the Work Plan. (JA 355/66). Accordingly, when he began transitioning responsibility for the Work Plan to Parker, Darko was working on an update to the Work Plan due in January 2019, and during the month of January, this update remained primarily Darko's responsibility. (JA 353-54/61-62; JA 355/66).

Sheikh expected Parker and Darko to share responsibility for ISSC reporting, including updating the IS Work Plan, through the end of February 2019. (Sealed JA 75-78). Since Parker was a new Information Security Risk person at IDB, she had to learn from Darko how security reporting and remediation was done at IDB. Specifically, while Sheikh asked Parker to "own[]" certain tasks, Darko was expected "to show [Parker] how reporting is gathered, updated and reported along with scheduling of ISSC meetings." (Sealed JA 78); *see also* Sealed JA 75 ("Teddy [Darko] will assist you until the end of February"). Darko had been responsible for IDB's IS Work Plan before Parker began employment with IDB. (JA 352/54-56).

On January 3, 2019, Parker met with Darko to discuss transitioning risk responsibilities. (Sealed JA 80). One responsibility involved updating the IS Work

4

Plan. (JA 344/23-24). The Information Security team was responsible for presenting the Work Plan to IDB's Board of Directors and senior management at monthly meetings of the Information Security Steering Committee ("ISSC"). (JA 444 ¶ 30). However, while ISSC meetings were regularly scheduled prior, during, and after Parker's employment with IDB, date cancellations and meeting topic modifications were often made. (JA 457 ¶ 60).

The January meeting of the ISSC was initially set for January 23, 2019, but the Bank postponed the presentation of the Work Plan, first to January 30, 2019, and later to February 13, 2019. (JA 93). The delay was unrelated to Parker, as the committee had a large amount of material to review on January 23, 2019. (*Id*.) As the district court noted, "Because of the volume of information on the ISSC agenda, the meeting was split into two meetings, one for January 23, 2019, regarding issues other than the Work Plan, and a second scheduled for January 30, 2019, to discuss the Work Plan." (SPA 5).

The Work Plan, particularly its IT and cybersecurity vulnerability risk remediation activities, required coordination with a number of different people and departments within the Bank, and it was common for updates to be delayed while the Information Security team waited for information from other departments. (JA 330/35; JA 345/27-28; JA 357/75-77). As a new employee, Parker needed the transition period to become familiar with the people, data and methods that went into

5

this complex report. (JA 355/66).

While deadlines for the Work Plan were linked to the timing of the monthly ISSC meeting, Darko testified that these deadlines were "flexible," and it was not unusual for him and other members of the Information Security team to experience delays in completing the update. (JA 330/36; JA 344/22; JA 354/64). Darko recalled that "sometimes there would be a delay in completing the work plan." (JA 353/59). During Parker's employment with IDB, Sheikh never expressed concern to Darko about the progress of the January 2019 Work Plan. (JA 354/63-64).

### 3. Plaintiff's hand injury and accommodation requests.

On January 10, 2019, Parker injured her finger in a major fall in which her left middle finger bent backwards upon impact with the ground. (JA 465 ¶ 84). When Parker arrived at work later that morning, she informed Sheikh that she had severely injured her hand and could now only type slowly with one hand. (Sealed JA 87). Having also sustained a head injury and knee contusions along with the finger sprain (Sealed JA 67), Parker took over-the-counter pain medication and, when her hand injury had not resolved within a few days, she sought medical treatment. (Sealed JA 16-24). Parker was later diagnosed with a Proximal Inter-Phalangeal (PIP) sprain in her left middle finger. She had to wear a finger splint and later another finger joint correction device. (*Id*.); *see also* Sealed JA 27, 180-83, 185-86. While Parker was able to type in the weeks following her injury, she was no longer able to type quickly

6

at dictation speed or for long periods of time. (JA 249/288). The injury caused Parker severe pain and limited her ability to perform a number of "activities of daily living," including picking up and carrying items and other weight-bearing activities, gripping items, opening doors and jars, cleaning, and cooking. (Sealed JA 21, 90-118). On January 17, 2019, Parker sought medical attention for her injury and was advised to rest, wear a finger splint, and limit use of her finger. (Sealed JA 16).

It soon became clear that Parker's injury would likely have long-term and permanent effects on her daily life. (Sealed JA 21, 27-62). Parker visited a hand surgeon and orthopedist on January 31, 2019, who prescribed occupational therapy. (Sealed JA 16-17, 117). Later that evening, she attended an intake appointment for occupational therapy and began a three-month course of therapy on February 1, 2019 for her knee injury and her hand. (Sealed JA 90-118, 122-178). One of Plaintiff's stated goals for finger therapy was to decrease pain associated with "self-care, lifting, carrying, and typing tasks" and to perform "work duties without pain or limitations." (Sealed JA 117). Parker's orthopedic surgeon advised that a PIP sprain could be debilitating and take a long time to improve, and that symptoms could continue for months or years. (Sealed JA 23-24). A hand therapist described Parker's injury as chronic, and in May 2019, more than four months after her fall, Parker's orthopedic surgeon advised that some symptoms might not resolve for months and could be permanent. (Sealed JA 23-24, 27-62). Parker ultimately

completed four months of occupational therapy and continued to seek medical attention for pain and lack of dexterity associated with her injury as recently as January 2020, one year after her injury. (Sealed JA 61-62, 184-86).

On January 9, 2019, the day prior to her injury, Parker requested a hands-free headset, which had already been provided to her team members Darko and Raval. (JA 468 ¶ 94). The following day, after her injury, Parker told Sheikh that she was injured and typing with one hand, which made the requested desk supply of a headset more urgent. (Sealed JA 87). Sheikh did not respond to her request for five days, after she sent a follow-up email. (JA 248/283-84; JA 471 ¶ 101; Sealed JA 87). Parker did not receive a headset until January 16, 2019. (Sealed JA 86-88).

On January 22, 2019, Parker emailed Darko and Sheikh and told them that, contrary to medical advice, she had overworked her finger completing deliverables for work and would be unable to take notes at the ISSC meeting the following day. (JA 473 ¶ 105). She asked Darko to take notes for the meeting on her behalf; Darko agreed to do so. (JA 473-75 ¶¶ 105, 109). While Sheikh did not respond to Parker's email, he expressed annoyance and frustration at Parker's need for disability accommodations. (JA 170 ¶¶ 9, 12). Parker, for the first time, handled several other tasks associated with the meeting, including sending an invitation, creating the agenda and slides for presentation at the meeting, and making grammar/clarification corrections to Darko's minutes after the meeting. (JA 95-96; Sealed JA 214-16). On

8

January 29, 2019, Sheikh forwarded to Vice President of Human Resources Robert Faynblut the email from Parker where she asked Darko to take notes on her behalf; Sheikh wanted to discuss this matter with Faynblut, suggesting the matter was urgent ("let's discuss this when you get a chance. Left you a [voice mail] as well"). (Sealed JA 211).

### 4. Plaintiff works with Darko on the Work Plan and other tasks.

In the weeks following her injury, Parker continued to help Darko update the Work Plan and communicated regularly with Sheikh about revisions and additions to the document. (JA 95-96; JA 170 ¶ 8; JA 214/147; JA 457-460 ¶¶ 61-65; Sealed JA 64-65, 201). Sheikh generally preferred to review the document in hard copy and often made handwritten revisions, which he expected Parker to type for him. (JA 170 ¶ 8). On January 31, 2019, Sheikh asked Parker to see a copy of the draft Work Plan. (Sealed JA 64). Parker emailed him a copy on February 1, 2019. (JA 305/147).

Parker and Darko were also jointly responsible for creating a PowerPoint presentation of the Work Plan for the forthcoming February ISSC meeting. (JA 283/61; JA 344/24). Prior to Parker's hiring, Darko had used an unlicensed and unvetted external software program to convert the Work Plan document content from PDF to PowerPoint formats. (JA 355/67). On February 1, 2019, Parker expressed concern to Sheikh about the dangerous cybersecurity risk associated with the use of the unauthorized program, and suggested that the Bank instead use a licensed product with

a non-disclosure agreement. (Sealed JA 209). Although, according to both Sheikh and Darko, use of the unlicensed software program was not a best practice for information security and was therefore risky, Sheikh did not respond to Parker's concerns, but he forwarded her email to Faynblut while he was in the process of creating a justification for her termination. (JA 309/163; JA 355/67-68; Sealed JA 209). Darko could not remember when the Bank stopped using the unvetted program. (JA 355/68).

### 5. Defendant terminates Plaintiff's employment.

During the week of January 28, 2019, Parker told Sheikh that, for the next several months, she would likely need to attend occupational hand therapy appointments on a regular basis. (JA 170 ¶ 10). Parker explained that she tried to schedule appointments outside of work hours but was unable to do so. (JA 254/306-08). When Parker met with Sheikh to discuss her injury and necessary accommodations, Sheik said, in words and substance, that she "would not survive" at the Bank due to her disability, implying that her days were numbered because of her requests for disability-related accommodations. (JA 170 ¶ 12). Based on Sheikh's hostile reaction to her accommodation requests, Parker contacted Human Resources on Monday morning, February 4, 2019, about submitting a formal request for accommodations, but she was unable to do so prior to her termination. (JA 58).

That same week, Sheikh met with Faynblut from HR to discuss Parker.

10

(Sealed JA 263-64). After this meeting, on January 28, 2019, Sheikh drafted an internal memorandum stating that Parker was not able to work in the Bank's "manual process environment." (*Id.*) Over the course of the following three days, Sheikh sought input from Faynblut and from the Bank's Chief Risk Officer Paul Caulfield in an attempt to pre-textually justify Parker's termination, creating at least four versions of the document. (Sealed JA 218-226, 237, 263-64). The second draft added an allegation that Parker had complained about "manual processes" and her complaints had been "noted" by her fellow Information Security team members. (Sealed JA 220). However, Raval, a member of Parker's group, could not recall hearing anyone at IDB complain about manual processes. (JA 328/29). Darko and Raval both testified that they never discussed Parker's performance with anyone at IDB and were never asked to provide feedback about her performance or statements. (JA 351/53; JA 276/32).

The fourth version of the memorandum was the first to mention a deadline for the Work Plan, but this deadline was not identified in the final version of this internal memo to pre-textually fire Parker. (Sealed JA 224; JA 548-49). This final version of the memorandum stated that Parker created "low morale." (JA 548-49). It also stated, for the first time, that Parker had refused to complete a task assigned to her by Sheikh, that she "will not continue to perform manual processes when it comes to non-structured and structured documents." (Sealed JA 226). Sheikh shared the final

11

memorandum with Faynblut and Caulfield on January 31, 2019, and Defendant asserts it made the decision to fire Parker that day. (Sealed JA 231, 237). On this point, Defendant argued that "[o]n January 28, 2019, Sheikh recommended that the Bank discontinue Plaintiff's probationary employment. The termination memorandum was simply finalized on January 31, 2019. Plaintiff cites to a position statement to the EEOC, which was prepared by the Bank's former counsel without the benefit of full discovery in the instant litigation." (JA 517 ¶ 238) (citing JA 82-86 and JA 463-64 ¶¶ 75-79). Parker's employment was terminated on the afternoon of February 4, 2019. (JA 465 ¶ 81). Parker's termination occurred only 60 days after she began working for the Bank. Sheikh testified that no other employee had been terminated prior to the end of their 90-day probationary period. (JA 300/129). Instead, employees were normally allowed to complete their 90-day probationary period in which a review of their performance was done after the 90th day (JA 300/128).

### The Decision Below

At the close of discovery, Defendant moved for summary judgment on Plaintiff's disability discrimination claims brought under the federal, state and city laws. On February 6, 2024, the district court granted that motion in full, dismissing the Complaint in its entirety. The district court ruled as follows:

1. On the ADA claim, the district court held that Parker did not have a qualifying

12

disability under federal law because, despite "present[ing] evidence that the injury to her finger limited her ability to perform certain tasks" (SPA 9), "her finger injury had, at most, a minimal impact on her ability to perform some tasks at work but did not substantially limit her ability to perform a broad range of jobs." (SPA 10). Nor may the jury find that "the Bank regarded her as having such a substantial limitation." (SPA 11). In addition, Parker's medical records "do not create a question of fact whether Plaintiff's major life activities were substantially limited at or before the time her probationary employment was ended." (SPA 12). These holdings disposed of Parker's ADA claims.

2. On the State HRL disability discrimination claim, the district court held that while Parker suffered a disability under state law because her hand injury "is a physical impairment demonstrable by medically accepted clinical diagnostic techniques" (SPA 20), "Sheikh documented Parker's performance failures beginning on December 28, 2018 -- about two weeks before she injured her finger -- and continued to contemporaneously document her negative attitude and missed deadlines through the date even Plaintiff concedes he had decided to terminate her employment." (SPA 21).

3. Nor may Parker prevail on her New York City HRL discrimination claim, the district court held, because her termination "occurred during her probationary period and followed demonstrable and contemporaneously-documented performance failures." (SPA 23).

13

4. As for Parker's claim that Defendant unlawfully denied her a reasonable accommodation in violation of the State and City HRL's, the district court held that Parker cannot prevail at trial because "[t]he evidence in the record shows that the Bank provided every accommodation for which she asked," as she (1) received a headset shortly after requesting one on January 10, 2019, (2) Darko took notes for Parker at a meeting at her request, and (3) the Bank approved her request to attend an occupational therapy appointment during work hours on February 1, 2019. (SPA 22).

5. The retaliation claims were also dismissed. The district court rejected the ADA and state law retaliation claims because Parker cannot prove her requests for a reasonable accommodation caused her termination. The district court reasoned that "concerns about the quality of [Parker's] work began before she was injured and the decision to terminate her probationary employment was made before she engaged in any protected activity." (SPA 14). The City HRL retaliation claim was also dismissed because at the time this claim accrued, "requesting an accommodation for a disability did not qualify as protected activity under NYCHRL." (SPA 19).

## Questions Presented

1. May the jury find that Parker had a qualifying disability under the Americans with Disabilities Act?

2. May the jury find that Defendant terminated Parker's position because she had sustained a medical disability and would require reasonable accommodations?

14

## Summary of Argument

The district court improperly granted Defendant's motion for summary judgment on Parker's disability discrimination claims brought under the Americans with Disabilities Act and the New York State and City Human Rights Laws.

First, the record supports the inference that Parker had sustained a disability under federal law. Parker's medical records show that medical providers said her injury was chronic and that some of its effects were likely permanent. The records show that Parker sought treatment for her injury, which her provider continued to describe as "chronic" as recently as January 2020, a year after her fall. By then, Parker was still experiencing pain and limited dexterity. Her hand injury affected her ability to work, and it also substantially limited several major life activities in her personal life.

On the merits, the jury may find that Parker makes out a *prima facie* case under federal, state, and city law, and that the real reason for her termination was her disability, not job her performance. The sequence of events permits the inference that Defendant became impatient with Parker after it learned about her injury and the need for a reasonable accommodation, and Parker was blamed for the last IS Work Plan even though she was not solely responsible for it. Relatedly, she was the victim of disparate treatment, and Sheikh angrily told Parker, in the context of discussing her injury, that she "was not going to survive at IBD." The evidence comprising the

15

*prima* facie case, by itself, supports a finding of discrimination. While this Court has held that discrimination plaintiffs are not required to prove the articulated reason for their terminations are a pretext, only that the adverse decision was motivated by discriminatory intent, the jury may nonetheless find that that the reasons advanced by the Bank were categorically not true and intended to shield its discriminatory intent.

## Argument

### The district court improperly granted summary judgment on Parker's disability discrimination claims brought under the ADA and the State and City Human Rights Laws

"In reviewing all of the evidence to determine whether judgment as a matter of law is appropriate, 'the court must draw all reasonable inferences in favor of the nonmoving party,' 'even though contrary inferences might reasonably be drawn.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" (*Id.*)

"In reviewing the evidence and the inferences that may reasonably be drawn, the court 'may not make credibility determinations or weigh the evidence . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (*Id.*)

16

"Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." *Id*. at 546. "Summary judgment is proper only when, with all permissible inferences and credibility questions resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict." (*Id*.) The standard of appellate review is *de novo*. (*Id*.)

### Point I

### Plaintiff has a qualifying disability under the disability laws

Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities." *Hamilton v. Westchester Cnty.,* 3 F.4th 86, 92 (2d Cir. 2021). Major life activities are those "that are of central importance to daily life," including "functions such as caring for oneself [and] performing manual tasks." *Capobianco v. New York*, 422 F.3d 47, 56 (2d Cir. 2005); *see also* 29 C.F.R. § 1630.2(i).

A plaintiff is disabled under federal law if she (1) has a physical or mental impairment that "substantially limits" one or more "major life activities"; (2) has a "record of such an impairment"; or (3) is "regarded as" having such an impairment. 42 U.S.C. § 12102(1).

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the

17

> individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii); *see Parada v. Banco Indus. De Venez.*, 753 F.3d 62, 69 (2d Cir. 2014). This inquiry "usually will not require scientific, medical, or statistical analysis," 29 C.F.R. § 1630.2(j)(1)(v); *Clark v. Stop & Shop Supermarket Co.*, 15-CV-0304 (JCH), 2016 WL 4408983, at \*4 (D. Conn. Aug. 16, 2016), and is made "without regard to the ameliorative effects of mitigating measures." 42 U.S.C. § 12102(4)(E); 29 C.F.R. § 1630.2(j)(1)(vi). In determining whether an individual is disabled under the ADA, the Second Circuit rejects "bright-line tests" in favor of a "fact-specific inquiry." *Parada*, 753 F.3d at 69. Relevant considerations include "the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function." 29 C.F.R. § 1630.2(j)(4)(ii).

The ADA Amendments Act of 2008 "broadened the definition of 'disability' under the ADA" and primarily sought "to overrule the Supreme Court's arguably narrow interpretation of what constitutes an ADA-qualifying disability . . . and to make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one." *Hamilton*, 3 F.4th at 92. As such, "'[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum

18

extent permitted by the terms of the ADA,' and 'is not meant to be a demanding standard.' Relatedly, the term 'substantially limits' is to be interpreted and applied to require a lower degree of functional limitation than the standard required prior to the ADAAA." (*Id.*) (citing 28 C.F.R. § 35.108(d)(1)(i)(vi)). Accordingly, "'[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.' Therefore, 'the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.'" *Dipinto v. Westchester Co.,* 18-CV-793 (KMK), 2019 WL 4142493, at *7 (S.D.N.Y. Aug. 30, 2019) (citing 29 C.F.R. § 1630.2(j)(1)(i)(iii)).

Parker's medical providers said her injury was chronic and that some of its effects were likely permanent. (Sealed JA 21, 23-24, 27-62). Parker's hand surgeons and therapists advised it would take years to heal her finger. (JA 170 ¶ 13; Sealed JA 24). The medical records show that Parker sought treatment for her injury, which her provider continued to describe as "chronic" as recently as January 2020, a year after her fall. By then, she was still experiencing pain and limited dexterity. (Sealed JA 184-86).

Parker's hand injury affected her ability to type, creating a substantial limitation on the major life activity of working because it impacted her ability to perform jobs

19

involving typing quickly at dictation speed or for extended periods of time. *See Greenbaum v. New York City Transit Auth.,* 2022 WL 3347893, at *2 (2d Cir. Aug. 15, 2022) (summary order) (finding an employee with tendonitis was substantially limited in working because he could not perform "a class of jobs involving use of a keyboard or mouse for periods of time beyond the limitations he experienced") (citing *Bartlett v. N.Y. State Bd. of Law Examiners*, 226 F.3d 69, 83 (2d Cir. 2000)).

In ruling otherwise, the district court held that, even following her injury, Parker was able to use nine of her fingers and she "continued to type and do work despite her finger injury." (SPA 10) (citing JA 151 ¶ 103 and JA 112-15). Moreover, the district court stated, while the hand injury "slowed down [her] typing a bit," "she was able to complete tasks assigned to her." (*Id*.) However, while Parker was only able to type brief emails, whether work-related or personal, that does not compel the finding that she was not limited as described in her medical documents and testimony. A substantial limitation does not require that an employee be completely unable to perform the work activity in question. *See Bey v. City of New York*, 437 F. Supp. 3d 222, 232 (E.D.N.Y. 2020), *aff'd in part*, 999 F.3d 157 (2d Cir. 2021) ("Defendants' contention that 'substantial limitation' envisions a total restriction on performing an activity misinterprets the substantive requirements of proving a disability under the ADA"). A plaintiff has a "substantial limitation" under the ADA where she is "*[s]ignificantly restricted as to the condition, manner or duration* under

20

which an individual can perform a particular major life activity as compared to the condition, manner, or duration *under which the average person in the general population can perform that same major life activity*." *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(ii) (emphasis supplied). As Parker has produced evidence that her impairment substantially limited the speed, manner, and duration of her typing, this Court should reject the district court's reasoning and find she has a qualifying disability under federal law. (JA 250/290-91; JA 473 ¶ 105; JA 476 ¶ 114; Sealed JA 116-17, 211).

Parker also has a disability under the ADA because the record shows that, for months, her finger injury substantially limited a number of important manual and self-care tasks in her personal and working life on a daily basis, including lifting and carrying items, washing hair, opening doors, cooking, and doing dishes. (Sealed JA 21, 90-118). While only some of the activities limited by Parker's injury affected her work, they remain major life activities for purposes of determining whether she had a qualifying disability. *See Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("The inclusion of activities such as caring for one's self and performing manual tasks belies the suggestion that a task must have a public or economic character in order to be a major life activity for purposes of the ADA").

In assessing substantial limitations on major life activities, "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most

people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Klein v. Long Beach City Sch. Dist.*, No. 04 CV 526 (SLT) (ETB), 2009 WL 10708483, at *23 (E.D.N.Y. June 30, 2009) (finding that a plaintiff with a wrist injury restricting the use of one hand could be disabled based on limitations on household tasks and personal hygiene).

In holding that Parker does not have a disability under the ADA, the district court stated that her medical records do not specify which "activities of daily living" she was unable to perform. (SPA 12) (citing Sealed JA 21). Nor was it enough for Parker to highlight her physical therapist's March 28, 2019 visit summary, which states that she "still has pain and difficulty carrying groceries over 10 lbs." (*Id.*) (citing Sealed JA 124-25). The record proves otherwise. The orthopedic records state that her "pain is severe at times and often throbs" and she suffered a strain. (Sealed JA 16-17 [Jan. 31, 2019]). "[S]he has difficulty lifting simple objects including food" as well as "limited range of motion" and "her symptoms that are reported to me are a bit more profound when compared to the objective findings on the examination." (Sealed JA 19 [Feb. 14, 2019]). In addition, "she has difficulty typing and performing some activities of daily living" (Sealed JA 21 [March 28, 2019]); "she has difficulty with activities of daily living including opening her contact lens container, and other simple activities"; splinting devices has not alleviated the pain; and "it might take up to one year to two years [for] her symptoms to stabilize." (Sealed JA 23 [May 24,

22

2019]).

What is more, Parker's physical therapy records from February-March 2019 note she "still has pain with weightbearing type activities, and pulling open car doors" (Sealed JA 100), "Picking up groceries and opening jars is difficult" (Sealed JA 98, 108), she had difficulty donning and doffing clothing or performing hygiene activities (Sealed JA 116), and she reported "pain and difficulty picking up plates, dishes, and pots." (Sealed JA 96, 110). In addition, Parker "still has pain with weightbearing type activities, and pushing open doors," "has pain and difficulty with gripping activities, and still feel[s] very weak, doing dishes for any period of time is difficult (Sealed JA 94-95, 102, 116), and she "cannot cook," could not lift a crockpot, or wash dishes. (Sealed JA 104, 106, 112, 114).

In sum, while the district court concluded that "the injury to a finger on her non-dominant hand may have caused some discomfort and inconvenience," it held the medical records "do not create a question of fact whether Plaintiff's major life activities were substantially limited at or before the time her probationary employment was ended." (SPA 12). But, as demonstrated above, the records support the finding that Parker's major life activities were substantially limited at this time.

Contrary to the district court's finding, a jury could also find that Sheikh regarded Parker as disabled within the meaning of the ADA. Regardless of whether Parker's injury actually caused a sufficient impairment to qualify, Sheikh evidently

believed it to be ongoing. The inquiry into whether an employee is regarded as having a disability "turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability." *Simmons v. New York City Transit Auth.*, 340 F. App'x 24, 27 (2d Cir. 2009) (summary order). Parker told her employer that she was substantially limited in her ability to type, particularly at the speed of dictation, without indicating that she expected this limitation to resolve in the near future, and that she would have to attend occupational therapy regularly for the foreseeable future. (JA 58, 117; JA 170 ¶ 10; JA 250-51/290-91; Sealed JA 211). As the district court noted, Parker "told Sheik, Darko, and an employee in Human Resources that her injury slowed her typing." (SPA 11-12) (citing JA 58, 107-110, 117). A reasonable jury could find that Defendant regarded Parker as disabled within the meaning of the ADA.

The district court did find that Parker had a disability under the New York State HRL "because it is a physical impairment demonstrable by medically accepted clinical diagnostic techniques" (SPA 20) (citing Sealed 17, 69; *see also* Sealed JA 21, 117). Parker was substantially limited in the bodily functions of grasping and manual manipulation. Even if this were not the case, a disability is any impairment "which prevents the exercise of a normal bodily function *or* is demonstrable by medically accepted clinical or laboratory diagnostic techniques." Exec. Law § 296(1)(a) (emphasis supplied). Parker's medical records show that she was diagnosed

24

with a PIP sprain, which is a physical impairment. "[A]ny medically diagnosable impairment" is a disability under the NYSHRL. *Levine v. Smithtown Cent. School Dist.*, 565 F. Supp. 2d 407, 428 (E.D.N.Y. 2008).

However, the district court did not determine whether Parker has a disability under the City HRL. The City law defines disability as "any physical [or] medical impairment." N.Y.C. Admin. Code § 8-102. The fact that an impairment may be "minor" or "transitory" "has no bearing on [plaintiff's] NYCHRL claim." *Arazi v. Cohen Bros. Realty Corp.,* No. 20-CV-8837-GHW, 2022 WL 912940, at *10 (S.D.N.Y. Mar. 28, 2022). Because the record shows that Parker's impairments lasted for months, with ongoing permanent disfigurement and pain, and that Sheikh believed she would continue to need accommodations long term, a reasonable jury could conclude she was disabled under the City law.

### Point II

### The jury may find that Defendant terminated Plaintiff's employment because of her qualifying disability

**A. Plaintiff makes out a *prima facie* case.**

The district court held that Parker's ADA discrimination claim fails because she did not have a qualifying disability under federal law. (SPA 8-12). However, as demonstrated in Point I, that determination was reversible error and the jury may find that Parker in fact did have such a disability. While the district court held that Plaintiff had a disability under the State HRL (SPA 20), it further held that she cannot

25

prevail on her disability discrimination claim for the same reason summary judgment is proper on her retaliation claim under the State HRL: "no reasonable factfinder could conclude that the [hand] injury was the but-for cause of her termination." (SPA 21). " Sheikh documented Parker's performance failures beginning on December 28, 2018 -- about two weeks before she injured her finger -- and continued to contemporaneously document her negative attitude and missed deadlines through the date even Plaintiff concedes he had decided to terminate her employment." (SPA 21). For this reason, the district court also granted summary judgment on the City law claim. (SPA 23-24).

### B. The jury may link Parker's disability with Defendant's decision to terminate her employment.

To make out a *prima facie* case of disability discrimination, "the plaintiff does not need substantial evidence of discriminatory intent. If she makes a showing (1) that she is a member of a protected class, (2) that she was qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the *prima facie* requirements and a presumption of discriminatory intent arises in her favor, at which point the burden of production shifts to the employer, requiring that the employer furnish evidence of reasons for the adverse action." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

"At this stage, a plaintiff seeking to defeat a defendant's motion for summary

26

judgment would not need evidence sufficient to sustain her ultimate burden of showing discriminatory motivation, but could get by with the benefit of the presumption if she has shown evidence of the factors entitling her to the presumption." (*Id.*)

Contrary to the district court's finding, Parker makes out the elements of her *prima facie* case. First, as demonstrated above, Parker had a disability under the federal, state and city laws. Despite Defendant's articulated reasons for Parker's termination, she was also qualified for her position, as management had recently hired her, and Sheikh testified that Parker "was a better fit" than the other candidates and she had "solid experience in technology [and] in information security" and "an understanding of the banking environment." (JA 276/32-33; JA 309/162-63). This Court has emphasized the difference between "qualified for the job" and terminating the plaintiff over job performance. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) ("there is a distinction between unsatisfactory job performance and misconduct," as "'misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee,' but that this issue is distinct from 'the issue of minimal qualification to perform a job.' Instead, . . . the inquiry should focus on the plaintiff's competence and whether [s]he 'possesses the basic skills necessary for performance of [the] job'"). The issue therefore turns on whether Parker was terminated under circumstances giving rise to an inference of discrimination. The jury may find that

27

she was, rounding out the *de minimus prima facie* case.

"[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: . . . 'the employer's . . . invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009). Parker satisfies these elements.

First, the sequence of events permits the inference that Plaintiff was fired because of her disability. After Parker suffered the hand injury on January 10, 2019, she immediately told Sheikh that she could only type slowly with one hand. (Sealed JA 87-88). Parker also reiterated her prior pre-accident new employee desk supplies request for a headset to facilitate performing her work despite the injury to her finger. (*Id.*) The headset would have allowed Parker to "talk and type in tandem." (SPA 3). Then, on January 22, 2019, further signaling that her hand injury would not heal anytime soon, and that the Bank was going to have to accommodate her injury, Parker asked Darko to take minutes on her behalf at a meeting scheduled for the following day. (JA 112-17). The first written confirmation that management was contemplating Parker's termination came on January 28, 2019, when Sheikh sent Human Resources a draft memorandum that recommended this adverse action. (JA 83). Relatedly, as the district court noted, a series of emails between Parker, Sheikh and Darko further referenced her hand injury. (SPA 17)

28

(citing JA 117; Sealed JA 211). These exchanges "occurred roughly contemporaneously with Sheikh sending Human Resources the draft memorandum recommending her discharge." (SPA 17). A reasonable jury may find that Parker was denied a full probationary period as Sheikh rushed to fire her quickly when he learned after January 2019 that her finger injury was serious and likely permanent, would require longer term physical therapy during daytime work hours, and would restrict her typing at dictation speed.

While the district court credited Sheikh's testimony that he decided to terminate Plaintiff's employment on January 28, 2019 (SPA 14), the only evidence in support of that factual conclusion was Sheik's deposition testimony. (*Id.*) (citing JA 300/129). Sheikh is not a disinterested witness in this case. A jury need not credit the moving party's evidence unless it draws from a disinterested witness and is neither contradicted nor impeached. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *Cameron v. City of New York*, 598 F.3d 50, 60 (2d Cir. 2010). The temporal proximity between Parker's hand injury and Sheikh's recommendation that the Bank terminate her employment -- three weeks -- supports her minimal *prima facie* burden under federal, state and city law.

Moreover, as the district court noted in rejecting Parker's discrimination claim under the City HRL, on January 22, 2019, Parker emailed Darko to advise that he had to take meeting minutes because "I'm still typing quite slow due to this left hand injury"

and, "[a]gainst doctor's orders, I overworked it too much today with all these deliverables." (Sealed JA 211). On January 29, 2019, Parker forwarded this email to Sheikh, writing, "Below proof that I was not to handle the console and open up my environment at last week's meeting. I can't due to my hand injury. Teddy [Darko] or yourself was supposed to do that." (*Id*.) That day, Sheikh forwarded this email chain to Human Resources, writing, "Let's discuss this when you have a chance. Left you a [voice mail] as well." (*Id*.) As the district court noted, Sheikh sent HR this email "about two hours before sending his memo recommending Parker's termination." (SPA 24) (citing *inter alia* JA 82).

The jury may wonder why Sheikh sought an urgent conversation with HR about Parker on the same day she reminded him about her slow-to-heal hand injury. The inference favorable to Parker's position was that this email exchange was the last straw, demonstrating that Parker's hand injury was not short-term and would require additional workplace accommodations, prompting Sheikh to draft the termination recommendation that same day and allow the Bank to fire an employee who was making these (legal) demands on her colleagues. While, as the district court noted, Sheikh's "email includes neither explicit statements nor implicit suggestions that Sheikh considered Parker's finger injury in his decision to terminate her," and that Sheikh only wanted to discuss Parker's "imperious" email with HR (SPA 24), the timing of Sheikh's contact with HR supports a finding that Parker's injury played a role in her termination. Moreover, there was nothing

30

"imperious" about Parker's emails to Sheikh or Darko. Sheikh's emails to HR bolster Parker's *prima facie* case.

Further evidence in support of Parker's *prima facie* case relates to the IS Work Plan. In his draft memorandum recommending Parker's termination, Sheikh mentioned her failure to timely complete the Work Plan. (JA 83). As an initial matter, contrary to Defendant's assertions that Parker had not provided a draft of the Work Plan by January 28, 2019 (JA 458 ¶ 63), she stated in an email dated January 22, 2019 (responding to Sheikh's request for an update), that she planned to print out the Plan, and Sheik generally provided handwritten feedback on a hard copy of the plan. (JA 95; JA 345/28-29; Sealed JA 239-261). While Defendant argued on the summary judgment motion that "Sheik's request that Plaintiff send him such a draft strongly suggests that he had not yet received it" (JA 459 ¶ 63), any such disputed inferences are for the jury and cannot predicate an order granting summary judgment.

In any event, the jury may find that Parker was treated differently than Darko, who was not disabled. Darko testified that deadlines for the Work Plan, for which he had previously been responsible, were flexible and not always met. (JA 344/22; JA 354/64). Defendant claimed it punished Parker for an allegedly late Work Plan. Yet, emails concerning the Work Plan following Parker's termination in February 2019 demonstrate this flexibility of the deadlines when Darko resumed full responsibility for the Work Plan again. (Sealed JA 203, 207-09). While Bank employees testified that

31

there was a deadline for the Work Plan in connection with meetings of the ISSC, documents show that the timing of this meeting changed several times during Parker's employment. (JA 93). There was also conflicting testimony over whether responsibility for the Work Plan had been transferred to Parker at the time of her termination, with Darko testifying that it had not. (JA 95-96; JA 244/268; JA 330/34; JA 355/66). While the district court discounted this evidence on the basis that, unlike Parker, Darko was not a probationary employee and thus not similarly-situated to Plaintiff (SPA 17), "'Whether two employees are similarly situated ordinarily presents a question of fact for the jury.' '[W]e [have] made it clear that this rule does not require a precise identicality between comparators and the plaintiff.' [F]or such evidence to be probative, and therefore to support a jury verdict, there must only be an objectively identifiable basis for comparability." *King v. Aramark Servs. Inc.*, 96 F.4th 546, 563 (2d Cir. 2024); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("To satisfy [the] 'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards"). Moreover, if these duties had not yet been fully transferred to Parker at the time of her termination, the jury may find that she was terminated over a coworker's job deficiency.

The jury may also credit Parker's testimony that Sheikh began treating her harshly after she asked Darko to type minutes on her behalf following the hand

32

injury. (JA 170 ¶ 9). On January 29, 2019, when Parker "discussed further details of my injury, . . . [Sheikh] became angry and threatened me that I was not going to 'survive' at IDB." *Id.* at ¶ 12. Sheikh said this *on the same day* he sent a draft memorandum to HR recommending Parker's termination. (JA 82). While the memo itself was dated January 28, 2019 (JA 83), Sheikh's contemporaneous hostility toward Parker's injury reflects his state of mind at the time he settled upon firing Parker.

In rejecting this evidence, the district court held that "[t]hese post-discovery statements are unsupported by any other evidence in the record, including Parker's own deposition, and, as such, should be given little weight." (SPA 16). However, since the district court did not find, and Defendant did not assert in its summary judgment reply brief (ECF 84, at 8-9), that Parker's declaration expressly contradicted her deposition testimony, the jury may credit her sworn account at trial. Witness credibility is for the jury, not the district court on a motion for summary judgment. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 875 (2d Cir. 1992) ("The jurors heard both the testimony of [the plaintiff] on the point and that of [another witness], which tended to contradict it. They were free to settle upon which witness they believed"); *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (contention that the plaintiff's evidence is "uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment where

every reasonable inference is to be drawn in favor of the non-movant").

Finally, the EEOC issued a probable cause finding on Parker's discrimination charge. (JA 428) (EEOC finding that there was no documentation that Parker "had a prior poor performance that warrants termination"). *See Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 306 (E.D.N.Y. 2013) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985) ("a finding of probable cause by an administrative agency, such as the EEOC, though not determinative, is admissible to help establish [a] *prima facie* case"). As a result, the EEOC found that IDB's defenses did not "withstand scrutiny" and there was "reasonable cause to believe that [IDB] . . . discriminated against" Parker. (JA 428). While the district court discounted the EEOC's probable cause finding on the basis that it "lacks legal or factual support" (SPA 16), Defendant's eight-page, singled-spaced, EEOC position statement detailed all the factual and legal arguments available to it. (Sealed JA 228-235). The EEOC noted that it had conducted an investigation in which Defendant evidently had the opportunity to produce evidence in its favor. (JA 428-29). Whether or not the EEOC conducted a sufficiently thorough investigation into Parker's discrimination claim is for the jury. For now, the probable cause finding supports her *prima facie* case.

### C. The jury may find that Defendant's articulated reason for Plaintiff's termination was a pretext for discrimination.

Since Defendant articulated a legitimate, non-discriminatory reason for Parker's termination -- job performance -- to prevail, Parker must show that discriminatory intent

34

was the real reason for her termination. This issue is for the jury.

This Court recently clarified the plaintiff's burden when the employer articulates a neutral reason for the adverse action. Under federal and state law, the plaintiff is not required to prove the employer's articulated reason is false. "[W]hile a plaintiff *may* satisfy the third-stage burden under *McDonnell Douglas* by showing that the employer's stated reason was false and just a pretext, or cover, for a discriminatory intent, a plaintiff is not *required* to demonstrate the falsity of the employer's proffered reason. Instead, 'a Title VII plaintiff can prevail by proving that an impermissible factor was a *motivating factor*, without proving that the employer's proffered explanation was not some part of the employer's motivation.' A plaintiff may rely on other evidence that an impermissible criterion was a motivating factor in the employer's decision to take the adverse action." *Bart v. Golub Corp.*, 96 F.4th 566, 570 (2d Cir. 2024) (citing *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010) ("A plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally furnishing a justification known to be false"); *Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997); and *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995) ("[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the *only* reasons and that the prohibited factor

35

was at least one of the motivating factors" (emphasis in original)); *see also id*. at 576 ("To satisfy the third-stage burden under *McDonnell Douglas* and survive summary judgment in a Title VII disparate treatment case, a plaintiff may, but need not, show that the employer's stated reason was false, and merely a pretext for discrimination; a plaintiff may also satisfy this burden by producing other evidence indicating that the employer's adverse action was motivated at least in part by the plaintiff's membership in a protected class").

While *Bart* is a Title VII case, this analysis would also govern cases brought under the ADA. And, while the ADA holds to the "but-for" and not the Title VII "motivating factor" causation test, for summary judgment purposes, that distinction is not dispositive. *Compare Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 846 n.5 (2d Cir. 2013) (while statutory "'retaliation claims must be proved according to traditional principles of but-for causation,' and '[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer,' . . . a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability," noting further that "[t]he determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact").

36

Even under the traditional pretext framework, the plaintiff may avoid summary judgment "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-[discriminatory] reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846. Evidence of pretext together with plaintiff's *prima facie* showing is sufficient, without more, to deny summary judgment. *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 392 (2d Cir. 2020) ("Ordinarily, plaintiff's evidence establishing a *prima facie* case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial. Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact") (quoting *Carlton v. Mystic Transp. Inc*., 202 F.3d 129, 135 (2d Cir. 2000)).

Under the City HRL, pretext alone is enough to survive a summary judgment motion, even without an additional showing of discrimination. The First Department endorses a broad model of proving disparate treatment, finding that "the maximum deterrent effect sought by the City HRL can only be achieved where covered entities understand that, whatever the urge may be to cover up their actual motivations before arriving in court, there can be no benefit for doing so once in court." *Bennett v. Health Mgt. Systems*, *Inc*., 92 A.D.3d 29, 43 (1st Dept. 2011). Rather than adopt

37

federal standards, which allow the employer in some cases to prevail even if the plaintiff was fired for pretextual reasons, *see Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir. 1997) (en banc), under the City law, plaintiffs may prevail if *any* of the employer's reasons are a pretext. *Bennett*, 92 A.D.3d at 43-44. The Appellate Division departs from the federal model because the latter "did not sufficiently consider factors crucial to interpreting the City HRL in a way that is 'uniquely broad and remedial.'" *Id.* at 42.

The evidence in support of Parker's *prima facie* case supports a verdict in her favor. As demonstrated *supra*, (1) the sequence of events permits the inference that Defendant lost patience with Parker once it learned about her injury and the need for reasonable accommodation, (2) Parker was blamed for the last Work Plan even though she was not solely responsible for the Work Plan, (3) Parker was the victim of disparate treatment, and (4) Sheikh angrily told Parker, in the context of discussing her injury, that she "was not going to survive at IBD."

Moreover, under the traditional pretext analysis, the jury may also reject Defendant's articulated reasons for Parker's termination. When asked at his deposition about the work Parker allegedly failed to complete in December 2018, Sheikh cited only tasks related to the Work Plan and the ISSC meeting. (JA 88-91; *see also* JA 284/162-63). This criticism is contradicted by other documents and testimony, including Sheikh's own memorandum justifying Parker's firing, which

38

show that these Work Plan duties were only assigned to Parker, with a contemplated two-month transition period, in early January. (*Id*.) Citing two emails from December 28, 2018, Defendant claimed that "work was not being completed as expected." (ECF 71 at 20). In fact, the emails do not refer to any uncompleted work, and in one email Sheikh thanked Parker for her experience and talent. (JA 88-91).

Defendant claimed on the summary judgment motion that Parker was fired, in substantial part, because she missed a deadline for the Work Plan. (ECF 71 at 20-21). However, since nothing in Defendant's summary judgment papers identified the specific deadline that Parker purportedly missed, a reasonable jury could deem this justification a pretext. *See Chambers v. TRM Copy Centers Corp*, 43 F.3d 29, 39-40 (2d Cir. 1994) (reversing summary judgment in part because of the lack of contemporaneous documentation in support of the plaintiff's termination); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("If Carlton's performance had declined, as defendant insists, it seems surprising that there was no contemporaneous proof of that fact"); *Spinelli v. City of New York, Law Dep't*, No. 13-CV-07112 (GBD) (SN), 2016 WL 11482071 at *13-14 (S.D.N.Y. Aug. 30, 2016) (finding pretext where supervisor's affidavit spelling out performance issues was not supported by contemporaneous records); *Kia Song Tang v. Glocap Search LLC*, No. 14-CV-1108 (JMF), 2015 WL 1344788, at *5 (S.D.N.Y. Mar. 24, 2015) (lack of any documentation evidenced pretext); *Memnon v. Clifford Chance US, LLP*, 667

F. Supp. 2d 334, 350-51 (S.D.N.Y. 2009) (finding pretext in the absence of contemporaneous writings documenting dissatisfaction with plaintiff's performance).

On the summary judgment motion, Defendant also placed heavy reliance on a self-serving memorandum written shortly after Parker's injury and accommodation requests. (ECF 71 at 20-21). Documents show that Sheikh created several versions of this memorandum, in consultation with IDB's Vice President of Human Resources and Chief Risk Officer, to contrive a reason to fire Parker. (Sealed JA 217-226, 237, 263-64; JA 304/143; JA 306/152-53; JA 328/29). Sheikh's initial memorandum did not state that Parker had missed a deadline or refused to perform manual tasks, or that her behavior had impacted staff morale. (Sealed JA 220, 224-26, 263-64). The final version of this memorandum referenced the impact of Parker's purportedly poor performance on her coworkers. (Sealed 224; JA 329/32; JA 351/53).

The jury may deem pretextual the justification that Parker was hurting "morale" (JA 134, 136, 143 ¶¶ 48, 53, 76), as Sheikh and Parker's coworkers admitted that he did not discuss Parker's behavior with other members of her team. Raval recalled no such conversation (JA 329/32-33), and Darko testified that no one directly sought his feedback on Parker's performance. (JA 351-52/53-54). Sheikh testified that he did not discuss Parker's attitude with other members of the group. (JA 304/143). In fact, Parker received positive feedback from her colleagues on several assignments that she completed during her time with IDB. (JA 170 ¶ 7).

40

Nor can post-hoc claims of Sheikh's subjective "perception that [Parker's] behavior was interfering with team morale" (ECF 71 at 22) support a grant of summary judgment. "[C]ourts must give particular scrutiny" to such subjective assessments, "because (1) 'any defendant can respond to a discrimination charge with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case' and (2) a discriminatory consideration such as age could play into the 'formation of subjective impressions.'" *Weiss v. JP Morgan Chase & Co*., 332 F. Appx. 659, 661 (2d Cir. 2009) (quoting *Byrnie v. Town of Cromwell Bd. of Educ*., 243 F.3d 93, 104-06 (2d Cir. 2001)).

Finally, Parker points to comparative evidence. Even accepting IDB's assertion that Parker was fired because she did not meet a deadline in connection with the Work Plan, Parker's non-disabled colleagues were not fired or disciplined when they failed to meet deadlines. (JA 330/36; JA 344/22; JA 354/64). Documents also show that when Darko had full responsibility for the Work Plan following Parker's termination, the Work Plan continued to be delayed beyond established deadlines; as of February 28, 2019, Sheikh, Darko, and Raval were still reviewing the Work Plan originally intended to be presented at the ISSC meeting scheduled for February 13, 2019. (JA 366/66; Sealed JA 203, 207-09). This constitutes further evidence that this purported basis for Parker's firing was pretextual and discriminatory. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) ("A showing that the

41

employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a *prima facie* case of discrimination"). Similarly, while Sheikh cited Parker arguing with him as a basis for firing her, he also stated that other employees whom he supervised argued with him, and that he argued with his own supervisor. (JA 304/143). In fact, the only time Parker expressed any hesitation about performing a requested task arose when she raised concerns to Sheikh about Darko's use of an unlicensed, unvetted external software program. (JA 355/67; Sealed JA 209). Although Parker was hired for her expertise in information security risk, and Sheikh and Darko agreed that the use of this program was risky, the Bank attempted to blame Parker for exercising her professional judgment. (JA 309/163; JA 355/67-68; Sealed JA 209).

Finally, "[A]n employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show disability discrimination." *Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017). Under the ADA, the responsibility to identify a reasonable accommodation is shared between the employer and the employee. *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 99-100 (2d Cir. 2009); *see also* 29 C.F.R § 1630.2(o)(3). The state and city human rights laws impose a similar obligation. *Fox v. Wholesale Corp.*, 918 F.3d 65, 78 (2d Cir. 2019) (state law); *Jacobson v. New York City Health & Hosp. Corp.*, 22 N.Y.3d 824, 833-34 (2014) (city law). Defendant's failure to engage in any interactive process over

42

Parker's disability further proves its discriminatory intent.

Defendant does not deny that it was aware of Parker's disability and was on notice that she needed accommodations and assistance related to her ability to type, specifically from her reiteration of a request for a headset and her request to Darko to type notes on her behalf. (Sealed JA 211). Parker also informed Defendant that she needed time off for brief medical appointments related to her disability. (JA 170 ¶ 10). However, Parker did not have to explicitly identify herself as disabled or request a specific accommodation to trigger the Bank's obligation to engage in the interactive process. *See Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 137 (2d Cir. 2008) ("[A]n employer has a duty reasonably to accommodate an employee's disability. . . . if the employer knew or reasonably should have known that the employee was disabled"). While the Bank maintained a written policy stating it will "engage in a good faith written or oral dialogue concerning the individual's accommodation needs," no such dialogue took place in Parker's case. (JA 58; JA 170 ¶¶ 9-14). When Parker told Sheikh again that she needed a headset because she was injured, Sheikh did not engage in "timely, good faith discussions" with Parker as required under IDB's policy. (JA 248/283-84). Instead, he did not respond to her request for five days, and then only after she followed up by email, and Parker was forced to obtain a headset from a coworker without assistance from Sheikh. (*Id*.) Sheikh did not even respond to Parker's request for a coworker to take notes on her behalf.

(JA 170 ¶ 9). Sheikh also expressed anger when Parker said she would need to attend occupational hand therapy as an accommodation. (JA 170 ¶ 12). Rather than actually engage in the interactive process with Parker, Sheikh fired her. (JA 255/310-11).

### Conclusion

This Court should vacate the grant of summary judgment on Parker's discrimination claim under federal, state, and city law.

Dated: August 6, 2024

Respectfully submitted,

*/s/ Stephen Bergstein*
Stephen Bergstein

Bergstein & Ullrich
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277

Counsel for Plaintiff-Appellant

**Certification**

Stephen Bergstein, co-counsel for Plaintiffs-Appellants, affirms that this brief complies with FRAP 32(a)(7) in that it utilizes non-proportional typeface with no more than 10.5 characters per inch. The font is Times New Roman 14-point. The brief contains 10,824 words.

*/s/ Stephen Bergstein*
Stephen Bergstein

**Special Appendix**
**Table of Contents**

Opinion and Order dated February 6, 2024..............................................................SPA 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/6/2024___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
MARIAN E. PARKER,                              :
                                  Plaintiff,   :
             -against-                         :
                                               :
                                               :        21-CV-7196 (VEC)
ISRAEL DISCOUNT BANK OF NEW YORK,              :
INC.; JOHN DOES [1-10],                        :        OPINION AND ORDER
                                               :
                                  Defendants.  :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Plaintiff Marian Parker sued Israel Discount Bank of New York Inc. (the "Bank"), her

former employer, for discrimination, failure to accommodate, and retaliation in violation of the

Americans with Disability Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the New York State

Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and the New York City

Human Rights Law, N.Y. City Admin. Code §§ 8-101 et seq. ("NYCHRL").[1]  Defendant moved

for summary judgment.  For the reasons discussed below, Defendant's motion is GRANTED.

## BACKGROUND

        Parker worked at the Bank as Technology Risk Officer from December 3, 2018, to

February 4, 2019, Def. 56.1 ¶¶ 14, 18, 81,[2] and she was subject to a ninety-day probationary

period for new hires, see Markel Decl., Ex. F; Ex. D, 127:7–20.  She reported directly to Ahsan

Sheikh, the Chief Information Security Officer ("CISO"), and worked closely with two other

members of her team: Theodore Darko and Vipul Raval.  Def. 56.1 ¶¶ 7, 14, 140.

---

[1]      Parker confirms in her memorandum that she is not asserting a hostile work environment claim, nor is she asserting claims against any John Does.  See Pl. Mem., Dkt. 76 at 1 n.1.

[2]      A comprehensive 56.1 Statement appears at Docket 82 and is cited as Def. 56.1.  All facts are undisputed unless otherwise noted.

Parker was responsible for, among other items, "[a]ssisting the Office of the CISO in meeting regulatory . . . requirements across the technology landscape," "[e]nsur[ing] the implementation and continuous adaptation of the risk framework," and "[e]xecut[ing] independent oversight, analysis, validation, monitoring and reporting of risks and controls around the Bank's technology landscape." Markel Decl., Ex. A at 1–2. Specifically, she worked with Darko to update the Information Security Work Plan (the "Work Plan"), which provided a roadmap for the Bank's information security functions and included audit outcomes, security goals, and compliance requirements. Def. 56.1 ¶¶ 25, 27. She also worked with Darko to prepare presentations for the Bank's Information Security Steering Committee ("ISSC") meetings. Def. 56.1 ¶ 30. Sheikh's plan was to have Parker eventually take full responsibility for the Work Plan and presentations to the ISSC, but she worked with Darko on these tasks through her termination date. Goodell Decl., Ex. 5–6.

Parker's Initial Complaints About the Bank's Technology

When Parker joined the Bank, it had purchased but not fully implemented a Governance, Risk and Compliance platform ("GRC"). Def. 56.1 ¶¶ 34, 37. A GRC platform allows information to be centralized and shared across an organization, and it minimizes the amount of manual data entry needed for compliance reporting. Def. 56.1 ¶¶ 34, 40. Parker was familiar with GRC and had used this type of platform when she worked at larger financial institutions. Def. 56.1 ¶ 35.

Parker, as a contributor to security reporting for the Bank, believed that, if fully integrated, GRC could have reduced the amount of required manual data entry. Def. 56.1 ¶ 40. Just days after beginning her employment at the Bank, she scheduled a meeting with IT professionals to discuss further implementation of the GRC platform. Def. 56.1 ¶ 38. She

thought that, without GRC, the reports she and her colleagues needed to prepare were "very, very difficult and cumbersome to do in Excel and Access."  Markel Decl., Ex. C, 248:19–249:6. Parker's colleagues testified that she repeatedly complained and expressed frustration about the lack of a GRC platform.  *See e.g.*, Markel Decl. Ex. G, 43:12–44:7; Ex. D, 142:20–25. According to Darko, Plaintiff "complained about the manual process of [the Bank] any time she got a chance" and "whenever there was something to do, that is when she would talk about this stuff."  Markel Decl., Ex. G, 43:12–44:7, 44:24–45:14.  Sheikh said that Plaintiff's criticisms were causing morale problems at the Bank and called her a "problem-identifier," rather than a "problem-solver."  Markel Decl., Ex. D, 79:19–81:2, 142:20–25.

Parker's Injury and Request for Accommodation

About a month after she began her employment at the Bank, on the morning of January 10, 2019, Parker fell and injured the middle finger on her non-dominant left hand.  Markel Decl., Ex. C, 263:23–264:20.  She did not immediately see a doctor; she was able to continue to type emails and perform her job.  Markel Decl., Ex. X; Def. 56.1 ¶ 103.  That said, Parker reported her injury to Sheikh and reiterated a prior request for a headset so she could "talk and type in tandem;"[3] she received a headset shortly thereafter.  Markel Decl., Ex. C, 283:10–284:20; Ex. W.

A week later, on January 17, 2019, Plaintiff went to urgent care to have her finger examined.  Markel Decl. Ex. C, 268:3–17, 270:9–13.  The injury was diagnosed as a sprain; Plaintiff was given a finger splint and advised to take over-the-counter medication for pain.  Def. 56.1 ¶ 88.

---

[3]     Parker had initially requested a headset the day before she injured her finger, but she renewed her request after the injury.  *See* Markel Decl., Ex. W.  In her deposition, Parker admitted that even if she had not injured her finger, she would still have received the requested headset.  Markel Decl. Ex. C, 284:16–20.

On January 22, 2019, Parker directed Darko[4] to take meeting minutes on her behalf at a meeting scheduled for the following day.  Markel Decl., Ex. Y.  She explained that she was "still typing quite slow due to this left hand injury."  *Id.*  Darko took minutes at the January 23 meeting (it was typically Darko's responsibility to take the meeting minutes), and he sent them to Parker.  *See* Markel Decl., Ex. G, 51:3–14; Ex. C, 259:2–12; Ex. Z.

On January 31, 2019, three weeks after her fall, Parker saw an orthopedist.  *See* Markel Decl., Ex. AA.  The orthopedist recommended Parker receive occupational therapy and "buddy tape" two of her fingers together.  *Id.* at 2.  With permission of the Bank, Parker attended her first occupational therapy appointment during working hours on Friday, February 1, 2019. Markel Decl., Ex. C, 305:9–306:11.  The next business day, Monday, February 4, Parker asked Human Resources for a "medical accommodation form."  *See* Markel Decl., Ex. BB.

<u>Parker's Work Performance and Ultimate Termination</u>

Beginning well before Parker was injured, Sheikh had concerns about her job performance.  On December 28, 2018, Sheikh sent two emails to Parker about her responsibilities and his expectations.  *See* Markel Decl., Ex. O.  In the first, he sent her a document explaining her key job responsibilities.  *See id.* at 1.  In the second, he told Darko and Parker about his plan to transfer work from the former to the latter.  *See id.* at 3–4.  He reminded Parker that "[k]ey to the reporting is accuracy and completeness" and that he "expect[s] a zero error rate on this task."  *See id.*  He also told Parker that Work Plan reporting should be finalized, approved, and sent "to all key stake holders of ISSC at least one week prior to the ISSC meeting."  *Id.* at 3.  He testified that he sent these reminder emails because during Parker's first

---

[4]        Sheikh was presumably aware that Plaintiff had directed Darko to take minutes at the meeting because Parker copied Sheikh on the email.  *See* Markel Decl., Ex. Y.

few weeks at the Bank she had failed to produce certain deliverables as required.  Markel Decl.,

Ex. D, 57:4–15.

Because of the volume of information on the January ISSC agenda, the meeting was split

into two meetings: one scheduled for January 23, 2019, regarding issues other than the Work

Plan, and a second scheduled for January 30, 2019, to discuss the Work Plan.  Markel Decl., Ex.

P.  On January 22, 2019 — one day before the first ISSC meeting, eight days before the Work

Plan meeting, and one day before the deadline to circulate the Work Plan materials — Sheikh

asked Parker about missing deliverables.  *See* Markel Decl., Ex. Q.  Sheikh asked to see the

meeting agenda for the January 23 meeting.  *Id.*  Instead of sending a draft, Parker asked whether

a detailed agenda was needed, clearly implying that no agenda had yet been prepared.  *Id.*

Sheikh told her a detailed agenda was required and explained why; he reminded Parker that

preparation of the agenda was her responsibility.  *Id.*  Sheikh also asked Parker if she had an

update on the Work Plan.  *Id.*  Parker responded that she would complete data input that day; the

record does not reflect whether she did, in fact, complete data entry for the Work Plan on

January 22.  *Id.*

On January 28, 2019, five days after the Work Plan should have been distributed, Sheikh

asked Parker to forward to him the draft Work Plan.  Markel Decl., Ex. R.  According to Sheikh,

he made the request because it was overdue.  Markel Decl., Ex. D, 92:4–24.[5]  Sheikh rescheduled

the Work Plan meeting to February 13, 2019; that gave the team more time to finalize the Work

Plan.  *See* Markel Decl., Ex. P.

---

[5]     Parker quibbles with Defendant's assertion that Plaintiff had not produced the Work Plan by January 28.
*See* Def. 56.1 ¶ 63.  Although she references an email in which she told Sheikh she would print the Work Plan for
him, significantly she does not assert (or point to any evidence to demonstrate) that she had actually done so prior to
January 28.  *Id*.

Parker's failure to produce the Work Plan on time prompted Sheikh to discuss concerns with Plaintiff's performance and behavior during her probationary period with Human Resources.  Markel Decl., Ex. D, 129:11–22.  On January 28, 2019 — before Parker asked for permission to schedule an occupational therapy appointment during work hours on February 1 and before she asked Human Resources for a formal accommodation form on February 4 — Sheikh spoke with Human Resources about terminating Plaintiff.  Markel Decl., Ex. D, 129:11–25.  Human Resources advised Sheikh to put his concerns in writing; Sheikh did so the following day.  Markel Decl., Ex. D, 130:3-10; Ex. M.  Sheikh's memo stated that he was not satisfied with Parker's (1) attitude and (2) her failure to complete assignments on time.  Markel Decl., Ex. M.

On January 31, Sheikh and Human Resources finalized the memorandum regarding the termination of Parker's probationary employment.  *See* Markel Decl., Ex. N.  The final draft, although edited for style and clarity, reflected the same two concerns that were reflected in the January 28 draft: Parker had a negative attitude toward the manual processes at the Bank and had failed to meet the deadline for the Work Plan.  *See id.*  Also on January 31, 2019, Sheikh told Human Resources that he would be in contact the following week to set "an actual separation date."  *Id.*

Parker eventually sent a draft Work Plan, riddled with mistakes, to Sheikh on February 1, 2019.[6]  *See* Markel Decl., Ex. T, Ex. D, 104:12-105:10; Goodell Decl., Ex. 35.  In the evening of

---

[6]        On January 30 and 31, 2019, Sheikh sent Parker additional information to be included in the Work Plan.  *See* Markel Decl., Ex. S.  He reminded her that he wanted to see the Work Plan on February 1.  *Id.*  On February 1, he sent Parker another email with the subject "IS Work Plan?" asking about the status of the document.  Markel Decl., Ex. H.  He reiterated his request that the document be provided to him that day before 3pm.  *Id.*  Parker committed to getting it to him before the end of the day.  *Id.*

Friday, February 1, 2019, Sheikh and Human Resources set Monday, February 4, 2019, as Parker's termination date.  *See* Markel Decl., Ex. U.

The Bank terminated Parker, as scheduled, on February 4 during a meeting with Parker, Sheikh, and a representative from Human Resources.  Markel Decl., Ex. C, 310:25–311:6.  Upon hearing the news, Plaintiff gestured for Sheikh to stop speaking, as she did not want to hear the reasons for her termination.  Def. 56.1 ¶ 82.

A month after she was fired by the Bank, Parker began working at Bank of China.  Def. 56.1 ¶ 115.  Her new role involved typing, and she did not seek any accommodations for her finger from her new employer.  Def. 56.1 ¶¶ 116-117.

## DISCUSSION

### I.  Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted).

While the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted).  Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)

SPA-007

(citation omitted).  A "scintilla of evidence" is not enough.  *Fincher v. Depository Tr.*, 604 F.3d

712, 726 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also D'Amico v. City

of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing

that [her] version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–

18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the

assertion of each purported undisputed fact . . . and, if controverting any such fact, [must]

support its position by citing to admissible evidence in the record").

Defendant moves for summary judgment on all of Plaintiff's claims, arguing that Plaintiff

does not have a qualifying disability and, even if she did, she faced neither discrimination nor a

failure to accommodate.  Finally, it argues that Plaintiff's termination was a result of

contemporaneously documented work failures, not because of her putative disability or any

request for accommodation.

## II.   Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination and Failure-to-Accommodate Claims Under the ADA Because Plaintiff Did Not Have a Qualifying Disability

The ADA prevents covered employers from discriminating against an employee because

the employee has a disability.  42 U.S.C § 12112(a) ("No covered entity shall discriminate

against a qualified individual on the basis of disability in regard to . . . discharge of employees.").

The Court evaluates claims of discrimination and failure to accommodate under the ADA using

the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).  *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  The first step of

the *McDonnell* test requires the plaintiff to make out a *prima facie* case by showing that (1) the

employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA;

(3) the plaintiff was qualified to perform the essential functions of her job with or without an

accommodation; and (4) the plaintiff suffered an adverse employment action because of her

8

disability. *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020). Claims for failure to accommodate require a showing that (1) the plaintiff has a disability, (2) the plaintiff's employer had notice of the disability, (3) the employee could perform the essential functions of her job with reasonable accommodation, and (4) the employer refused to make such accommodations. *Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023).

The Bank argues that Parker was not disabled within the meaning of the ADA. A person is disabled if she has "a physical or mental impairment that substantially limits one or more major life activities" or is regarded as having such an impairment. 42 U.S.C. § 12102(1); *see also Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021). Not every impairment or illness is a qualifying disability under the ADA. *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005); *see also Marecheau v. Equal Emp. Pracs. Comm'n*, No. 13-CV-2440 (VEC), 2014 WL 5026142, at *5–6 (S.D.N.Y. Sept. 30, 2014) (enzyme deficiency causing body odor after consuming certain foods not a disability). Instead, the impairment must (1) "limit a major life activity," and (2) "the limitation must be substantial." *Capobianco*, 422 F.3d at 56.

Major life activities are those "that are of central importance to daily life," and include "caring for oneself, performing manual tasks, . . . and working." *Id.* (citing 29 C.F.R. § 1630.2(i)). Parker has presented evidence that the injury to her finger limited her ability to perform certain tasks. *See* Markel Decl. Ex. Y (Parker directed Darko to take notes during a meeting because she was "still typing quite slow due to this left hand injury"); Markel Decl. Ex. BB (Parker asked human resources for a medical accommodation form because her injury "has slowed down [her] typing a bit").

The question then becomes whether limitations to the speed with which Parker could type creates a question of fact whether she was disabled under the ADA. The requirement that a

limitation be substantial is "not an exacting one." *Woolf*, 949 F.3d at 94.  Still, where the life activity at issue is working, the plaintiff must show that her condition substantially limited her from working in "a class or broad range of jobs"; showing merely the inability to perform a single, particular task is insufficient.  *Id.* at 95.[7]

The evidence, viewed in the light most favorable to the Plaintiff, shows that her finger injury had, at most, a minimal impact on her ability to perform some tasks at work but did not substantially limit her ability to perform a class or broad range of jobs.  Plaintiff, who is right-handed, injured the middle finger on her left hand.  Def. 56.1 ¶¶ 84, 92.  Plaintiff did not seek medical attention until one week after the fall when she went to urgent care.  Def. 56.1 ¶ 87.  The medical providers at the urgent care facility took x-rays, which revealed no chips or broken bones.  Def. 56.1 ¶ 89.  They advised Parker to take over-the-counter pain medication.  Def. 56.1 ¶ 88.

Plaintiff admitted that after the injury she was able to type emails "using nine of her ten fingers" and that she "continued to type and do work despite her finger injury."  Def. 56.1 ¶ 103; *see also* Markel Decl. Ex. X (emails Plaintiff typed the day after she injured her finger).  Although Plaintiff's finger injury "slowed down [her] typing a bit," Ex. BB, she was able to complete tasks assigned to her.  *See, e.g.*, Def. 56.1 ¶¶ 172, 192 (completing meeting agenda and draft Work Plan).  Plaintiff's own admission and the supporting evidence showing that she was able to complete assigned tasks after she was injured are fatal to her claim that the finger injury substantially limited the major life activity of working.

---

[7]     Defendant's argument that the temporary nature of Parker's disability makes it insubstantial is not persuasive. *See Hamilton*, 3 F.4th at 94 ("[A] temporary injury can constitute a qualifying disability, as long as the requirements of the ADA are met.").  That said, not all temporary injuries qualify as disabilities under the ADA. *See id.* (acknowledging that just because an impairment lasting less than six months *can* constitute a disability does not mean such an impairment *will* constitute a disability).

The only task Parker claims she could not complete was taking notes during a meeting, but it is unclear whether taking those notes even fell within Parker's job responsibilities. *See* Def. 56.1 ¶ 106 (notetaking was Darko's responsibility); Markel Decl., Ex. G, 51:3–14. But viewing the evidence in the light most favorable to the nonmovant and assuming notetaking was Parker's responsibility, inability to perform such a specific task does not amount to a substantial limitation on her ability to perform a "class or broad range of jobs." *Woolf*, 949 F.3d at 94. This conclusion is further supported by the fact that Parker, after her termination from the Bank, worked at Bank of China, where her job required her to type, without needing any accommodations. Def. 56.1 ¶¶ 115–117.

Parker relies on *Greenbaum v. New York City Transit Auth.*, No. 21-1777, 2022 WL 3347893 (2d Cir. Aug. 15, 2022), as authority for the proposition that the inability to type other than slowly is a substantial limitation on the major life activity of working. *See* Pl. Mem. at 13. But that case is inapposite. In *Greenbaum*, the plaintiff submitted evidence that his tendonitis was so severe that, during a flare-up, he could not "do any typing or mouse-clicking." *Greenbaum*, 2022 WL 3347893, at *2. Further, his employer, having acknowledged that the condition substantially interfered with his ability to complete his job duties, placed him on leave and eventually changed his work status from "Restricted Work Temporary" to "Restricted Work Permanent." *Id.* In contrast, there is no evidence that Parker was ever unable to type or click a mouse.

Nor has Parker presented any evidence to create a question of fact whether the Bank regarded her as having such a substantial limitation. Parker claims that "Sheikh evidently believed [the impairment] to be ongoing," Pl. Mem. at 15, but she provides no evidentiary support for that assertion. Although she told Sheikh, Darko, and an employee in Human

11

SPA-011

Resources that her injury slowed her typing, *see* Markel Decl. Ex. W, Y (emailing Sheikh and Darko about her slowed typing); Markel Decl. Ex. BB (emailing HR about her slowed typing), she continued to work and prepared numerous typed documents and emails. She was not (1) removed from projects involving typing, (2) placed on medical leave, or (3) noted as disabled in the Bank's system. There is simply no evidence in the record that Sheikh specifically or the Bank more broadly regarded her as disabled simply because a finger injury slowed her typing.

Finally, Parker attempts to show that her finger injury substantially limited other major life activities: lifting and carrying items, opening doors, cooking, and doing dishes. Pl. Mem. at 14 (citing Def. 56.1 ¶¶ 213–214). She provides two pieces of evidence in support of this assertion. First, she cites her orthopedist's March 28, 2019, visit summary which states, "[Parker] tells me that she has difficulty typing and performing some activities of daily living." Markel Decl., Ex. AA at 6. It does not specify which "activities of daily living" were affected. *Id.* Second, she cites her occupational therapist's March 28, 2019, visit summary which notes that Parker "still has pain and difficulty carrying groceries over 10 lbs." Goodell Decl., Ex. 11 at 2. While the injury to a finger on her non-dominant hand may have caused some discomfort and inconvenience, these medical records, viewed in her favor, do not create a question of fact whether Plaintiff's major life activities were substantially limited at or before the time her probationary employment was ended.

Because Parker has not raised a material question of fact whether her injury substantially limited her ability to work or perform other life activities, she cannot establish a prima facie case of discrimination or failure to accommodate under the ADA. Accordingly, Defendant's motion for summary judgment on Plaintiff's claims of discrimination and failure to accommodate under the ADA is granted.

**III.     Defendant Is Entitled to Summary Judgment on Plaintiff's ADA and NYSHRL
Retaliation Claims Because the Decision to Terminate Her Employment Was
Made Prior to Her Request for Reasonable Accommodation**

Title IV of the ADA prohibits an employer from retaliating against an employee for

engaging in ADA-protected activity.  42 U.S.C. § 12203.  To establish a *prima facie* case of

retaliation under the ADA, the plaintiff must show that "(i) [she] was engaged in protected

activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an

adverse decision or course of action was taken against plaintiff; and (iv) a causal connection

exists between the protected activity and the adverse action."  *Tafolla*, 80 F.4th at 125.  On the

causation element, the plaintiff must prove that but for the disability-related protected activity,

the adverse action would not have been taken.  *Id.*  The NYSHRL similarly prohibits retaliation

and is evaluated using the same standard.[8]  *See Benzinger v. Lukoil Pan Americas, LLC*, 447 F.

Supp. 3d 99, 124–25 (S.D.N.Y. 2020) (listing the same four elements for NYSHRL retaliation

and explaining that but-for causation is required to satisfy the fourth element).

The first three elements are not in dispute.  First, Parker's request for accommodation,

regardless of whether she had a disability or was entitled to such accommodations, is a protected

activity.  *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002)

(requesting accommodation is a protected activity under the ADA); *see also Daly v. Westchester

Cnty. Bd. of Legislators*, No. 19-CV-04642 (PMH), 2021 WL 229672, at *8 (S.D.N.Y. Jan. 22,

2021) (same, even if not entitled to accommodation).  Second, the Bank knew about her

protected activity because she made two requests — to attend physical therapy, *see* Markel

---

[8]      New York amended the NYSHRL in 2019 to render the standard for claims under that statute "closer to the
standard of the NYCHRL."  *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).  That
amendment applies to claims that accrued after October 11, 2019, and it does not apply retroactively.  *See
id.*  Because Defendant's challenged conduct occurred before October 2019, the Court applies the standards of the
pre-amended NYSHRL.

Decl., Ex. C, 305:24–306:11, and to obtain a medical accommodation form, *see* Markel Decl., Ex. BB — directly to the Bank. And third, she was terminated. Def 56.1 ¶ 81.

Plaintiff has not, however, proffered facts to create a triable issue as to whether her request for accommodation was the cause of her termination. Based on the evidence, no reasonable jury could find a causal connection between the protected activity and the adverse action because concerns about the quality of her work began before she was injured and the decision to terminate her probationary employment was made before she engaged in any protected activity. Indeed, as early as December 28, 2018, about two weeks before the injury, Sheikh reminded Parker of her job responsibilities because she had failed to produce certain work product in a timely way. Markel Decl., Ex. D, 57:4–15; *see also* Markel Decl., Ex. O (reminder emails stating that Sheikh "expect[s] a zero error rate on this task"). On the morning of January 22, 2019, after Parker had injured her finger but before she had requested any accommodation, Sheikh asked Parker for the agenda for an upcoming meeting; her response made it clear that she had not yet prepared the agenda. *See* Markel Decl., Ex. Q. On January 28, 2019, after Parker had directed Darko to take notes because of her slow typing but before she had made any accommodation request,[9] Sheikh asked Parker for the Work Plan, which was days overdue. *See* Markel Decl., Ex. R; Markel Decl., Ex. D, 92:4–24. That same day — again, *before* Parker asked the Bank for permission to schedule an occupational therapy appointment during working hours and before she asked Human Resources for a formal accommodation form — Sheikh decided to terminate Plaintiff's employment. Markel Decl., Ex. D, 129:11–14.

---

[9]     The email directing Darko to take notes at the meeting was not a "request" for accommodation. *See Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 137 (E.D.N.Y. 2023) ("Notably, to make a claim premised on a failure to accommodate, a plaintiff must show that she did, in fact, request an accommodation."). Parker told another employee, who was neither her supervisor nor a Human Resources employee, to take notes at a meeting. *See* Markel Decl., Ex. Y. She did not ask someone with power to do so to make changes to her work requirements because of her injury. *Cf. Tillman v. Verizon New York, Inc.*, 118 F. Supp. 3d 515, 540 (E.D.N.Y. 2015) (granting summary judgment where plaintiff did not properly seek an accommodation).

14

Sheikh sent a draft termination memo to Human Resources on January 29, 2019, again before Plaintiff had requested any accommodation. *See* Markel Decl., Ex. D, 130:3–10, Ex. M. On February 1, 2019, the day Parker requested permission to attend an occupational therapy appointment during work hours, she produced a draft Work Plan riddled with errors. *See* Markel Decl., Ex. D, 104:12–105:10; Goodell Decl., Ex. 35. Following up on Sheikh's earlier decision to terminate Parker, the Bank set a termination date of February 4, 2019. *See* Markel Decl., Ex. U.

On the morning of the planned termination, Parker asked Human Resources for a medical accommodation form. *See* Markel Decl., Ex. BB. Although she was terminated the same day she requested the accommodation form and one business day after seeking permission to attend a therapy appointment during working hours, such timing does not create a triable question of fact on causation because the undisputed evidence is that the decision had already been made to terminate her employment, *see* Markel Decl., Ex. U,[10] and it is beyond dispute that the Bank had concerns about her poor performance well before she requested any accommodation. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no inference of retaliation where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity"); *Heiden v. New York City Health & Hosps. Corp.*, No. 20-CV-10288 (LJL), 2023 WL 171888, at *24 (S.D.N.Y. Jan. 11, 2023) ("Were it otherwise, an employee concerned about the risk of an adverse action could forestall the action — and effectively hamstring his employer — with an artfully timed request for accommodation or complaint about

---

[10]    Plaintiff quarrels about when precisely the decision was made to terminate Plaintiff's employment. See Def. 56.1 ¶ 238 (Plaintiff contends Defendant "made the decision" to fire Parker on January 31, 2019, which Defendant denies, asserting that was the date the termination memorandum was finalized). Despite the quibble, both parties agree that the decision had been made by January 31, 2019, which was prior to her request for a medical accommodation form and her request for time off for a therapy appointment.

discrimination."). The undisputed facts show that concerns about Parker's performance arose before she was injured and the decision to terminate her probationary employment had been made before she requested accommodation for her injury; accordingly, no reasonable juror could conclude that her request for accommodation was causally linked to her termination.

Parker's other attempts to create a genuine dispute of material fact fail. First, she relies on the EEOC's finding of probable cause with respect to her claims. *See* Goodell Decl., Ex. 38 (EEOC finding that there was no documentation that Parker "had a prior poor performance that warrants termination"). Where, as here, the EEOC's finding lacks legal or factual support, the Court need not consider it or weigh it so heavily as to require denying summary judgment. *See Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 772 n.15 (S.D.N.Y. 2005) (giving no weight to the EEOC determination because it was "sparse and conclusory" and "provide[d] no indication of what the EEOC's investigation actually involved"); *Nicholls v. Philips Semiconductor Mfg.*, 760 F. Supp. 2d 407, 420 n.11 (S.D.N.Y. 2011) (granting summary judgment for employer despite contrary EEOC finding); *Iverson v. Verizon Commc'ns*, No. 08-CV-8873 (SAS), 2009 WL 3334796, at *10, n.36 (S.D.N.Y. Oct. 13, 2009) (same). Next, Parker cites to her own declaration opposing summary judgment, in which she states that Sheikh got "angry," treated her "harshly," and told her that she would never "survive" at the Bank after she requested accommodation. *See* Parker Decl. ¶¶ 9, 12, 14. These post-discovery statements are unsupported by any other evidence in the record, including Parker's own deposition, and, as such, should be given little weight. *See Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) (declining to credit the nonmoving parties' conclusory statements and personal beliefs); *Krow v. PineBridge Inv. Holdings U.S. LLC*, No. 19-CV-5711 (ER), 2022 WL 836916, at *10 (S.D.N.Y. Mar. 21, 2022) (declining to credit declaration, written over three

years after termination and contradicted by contemporaneous emails); *Kobrand Corp. v. Abadia Retuerta, S.A.*, No. 12-CV-154 (KBF), 2012 WL 5851139 (S.D.N.Y. Nov. 19, 2012) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment.").  Finally, Plaintiff argues that her termination was retaliatory because her colleague Darko, who shared responsibility for the Work Plan, was not fired for missing deadlines.  But Darko is not an appropriate comparator because he was an experienced employee well outside of his probationary period.  *See Gerzhgorin v. Selfhelp Cmty. Servs.,* No. 22-808, 2023 WL 2469824, at *2 (2d Cir. Mar. 13, 2023) (probationary employee is not similarly situated to non-probationary colleagues).

The best evidence Parker submitted to support even the possibility of a retaliatory intent is an email string among her, Sheikh, and Darko.  On January 22, 2019, Plaintiff emailed Darko, with a copy to Sheikh, directing Darko to take notes at the January 23, 2019, meeting, explaining that she was typing slowly due to her injury.[11]  Markel Decl., Ex. Y.  A week later, on January 29, Plaintiff forwarded that same email to Sheikh, using her January 22 email to Darko as "proof" that she "was not to handle the console and open up [her] environment at last week's meeting."  Goodell Decl., Ex. 25.  She wrote in the email to Sheikh, "I can't due to my hand injury.  [Darko] or yourself was supposed to do that."  *Id.*  Sheikh forwarded the January 29 email from Plaintiff to Human Resources asking to discuss when there was time.  *Id.*  Notably, that occurred roughly contemporaneously with Sheikh sending Human Resources the draft memorandum recommending her discharge.  This lone email, read in the light most favorable to the Plaintiff, simply does not create a question of fact whether her demand, more than a week

---

[11]    Plaintiff's email to her colleague stated: "You will have to take the minutes [during the January 23 meeting]."  Markel Decl., Ex. Y.

earlier that Darko take notes at the meeting, played any part in Sheikh's decision to end her employment.

But even if the evidence Parker has adduced were adequate to make out a *prima facie* case, the burden would then shift to the Bank to "articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Whitney v. Montefiore Med. Ctr.*, No. 21-CV-9623 (PAE), 2023 WL 7386400, at *22 (S.D.N.Y. Nov. 8, 2023); *see also Benzinger*, 447 F. Supp. at 124–25 (the burden-shifting also applies to NYSHRL claims). Because the Bank has articulated a legitimate and non-retaliatory reason for terminating Parker, the burden would shift back to Plaintiff to create a question of fact whether the Bank's explanation is pretextual. *Id.* At that point, "the presumption of retaliation arising from the establishment of the prima facie case [would drop] from the picture." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

As noted, the Bank has provided non-retaliatory reasons for the termination. In the Bank's contemporaneous termination memo, Sheikh explained that Parker was terminated because of her poor attitude toward the lack of automation at the Bank and because she missed deadlines, both of which occurred while Parker was still in a probationary status. Parker has not presented any evidence that those reasons are pretextual.[12]

In an attempt to create a question of fact as to pretext, Parker argues that the draft memorandum and the final termination memorandum are inconsistent, but characterizing them as inconsistent does not make them inconsistent. *See* Markel Decl., Ex. M (first draft describing poor attitude and missed deadlines as reasons for termination); Markel Decl., Ex. N (final draft

---

[12] Indeed, the email on which she relies to create an inference of causation confirms Sheikh's position that she had a bad attitude. *See* Goodell Decl., Ex. 25. While the context is not clear from the email string, the imperious nature of Plaintiff's explanation to her boss for her performance failure shines through. *See id.* ("[Darko] or yourself was supposed to do that.").

18

providing the same). The termination memos and other documents created around the time of her termination, as well as the paper trail documenting Sheikh's concerns about the quality and timeliness of her work, support the Bank's rationale for terminating her employment. *See Talbott-Serrano v. Iona Coll.*, No. 21-CV-1055 (CS), 2022 WL 3718346, at \*10–11 (S.D.N.Y. Aug. 29, 2022) (holding that no reasonable jury could find pretext where contemporaneous communications reflect performance concerns with no mention of disability). Parker insists throughout her brief that she was not a poor performer and did not miss deadlines. *See* Pl. Mem. at 18–20. But an employee's disagreement with an employer's assessment of performance does not stand, on its own, to create a question of fact whether the stated reason was pretextual. *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 CIV 3777 (CM), 2021 WL 4429784, at \*17 (S.D.N.Y. Sept. 27, 2021). And finally, even though the termination and the request for accommodation were close in time, temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. *Zann Kwan*, 737 F.3d at 847.

The evidence shows clearly that the Bank fired a probationary employee for having a negative attitude at work and for persistently missing deadlines over the course of her probationary period. Given the evidence, and because no reasonable trier of fact could conclude that Plaintiff's protected activity was the but-for cause of her termination or that the Bank's stated reasons for termination were pretextual, Plaintiff's claims of retaliation under the ADA and the NYSHRL fail.

## IV. Defendant is Entitled to Summary Judgment on Parker's NYCHRL Claim of Retaliation

In early 2019, when Parker's claims accrued, requesting an accommodation for a disability did not qualify as protected activity under NYCHRL. See *D'Amico v. City of New York*, 73 N.Y.S.3d 540, 558–59 (1st Dep't 2018) ("Neither plaintiff's request for a reasonable

accommodation nor his filing of an internal workers' compensation claim constitutes protected activities for purposes of the . . . City HRL[]." (internal citation omitted)).  Although the NYCHRL was amended on November 11, 2019, to broaden the definition of protected activity to include requests for accommodation, the amendment does not apply retroactively.  *See Piligian v. Icahn Sch. of Med.*, 490 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (noting that the "amendment contains no retroactivity provision").  Accordingly, the Bank's motion for summary judgment is granted as to her claim of retaliation under the NYCHRL.

**V.     Defendant Is Entitled to Summary Judgment on Parker's NYSHRL Claim of Disability Discrimination**

The four elements of a claim of disability discrimination under the NYSHRL are the same as the elements of an ADA claim: (1) the employer is subject to the NYSHRL; (2) the plaintiff was disabled within the meaning of the NYSHRL; (3) the plaintiff was qualified to perform the essential functions of her job with or without an accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability.  *Piligian*, 490 F. Supp. 3d at 716–17.  That said, the NYSHRL defines disability more broadly than the ADA.  *Koonce v. Whole Foods Mkt. Grp., Inc.*, No. 22 CV 10418 (VB), 2023 WL 8355926, at *4 (S.D.N.Y. Dec. 1, 2023).  Under the NYSHRL, a disability is "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21).  Although, as explained above, the injury to Parker's finger does not qualify as a disability under the ADA, the injury is a disability under state law because it is a physical impairment demonstrable by medically accepted clinical diagnostic techniques.  *See* Markel Decl., Ex. V at 3; Ex. AA at 2 (records showing that two medical professionals diagnosed Parker with a finger joint sprain).

20

That said, Parker has not created a triable question of fact as to whether she was discriminated against because of her disability because no reasonable factfinder could conclude that the injury was the but-for cause of her termination, *see Heiden*, 2023 WL 171888, at *22("[D]iscrimination claims under the ADA and NYSHRL both require but-for causation."), or that the Bank's stated reasons for her termination were pretextual.  As explained in further detail in Section III, Sheikh documented Parker's performance failures beginning on December 28, 2018 — about two weeks before she injured her finger — and continued to contemporaneously document her negative attitude and missed deadlines through the date even Plaintiff concedes he had decided to terminate her employment.  *See supra* note 10.

Viewing all of the evidence in the light most favorable to Plaintiff, there is no question of fact why her probationary employment was terminated: she had a bad attitude and failed to meet deadlines.  Because those factors are entirely disconnected from her injury, Defendant is entitled to summary judgment on her claim of discrimination under the NYSHRL.

**VI.     Defendant Is Entitled to Summary Judgment on Parker's NYSHRL and NYCHRL Claims of Failure to Accommodate Because the Bank Granted Every Requested Accommodation**

Parker's claims for failure to accommodate under NYSHRL and NYCHRL fail as a matter of law because she has not provided any evidence that the Bank ever denied any requested accommodation.  The elements of a failure-to-accommodate claim under NYSHRL are: (1) the plaintiff is a person with a disability under NYSHRL; (2) an employer covered by the statute had notice of the disability; (3) the plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) the employer refused to make an accommodation.  *See Piligian*, 490 F. Supp. 3d at 717.  NYCHRL contains similar elements for this claim.[13]  *See*

---

[13]      The NYCHRL differs from the NYSHRL in some ways that are not relevant to Parker's claims.  For example, the city law does not require the employee to show that she can perform the essential requirements of the

*Romanello v. Intesa Sanpaolo, S.p.A.*, 998 N.E.2d 1050, 1053 (N.Y. 2013).  Parker satisfies the

first element under both laws because she has a qualifying disability under NYSHRL, *see*

Section IV *supra*, and under NYCHRL, which defines "disability" as "any physical, medical,

mental or psychological impairment."  N.Y. City Admin. Code § 8-102(16)(a).  The Bank does

not dispute the second or third elements.

Parker's claims fail, however, because she has provided no evidence to create a triable

question of fact whether the Bank failed to provide any requested accommodation.  The evidence

in the record shows that the Bank provided every accommodation for which she asked.  On

January 10, 2019, the day Parker injured her finger, she asked for a headset to help her talk and

type simultaneously, and she received one shortly thereafter.  Markel Decl., Ex. C, 283:10–

284:20; Ex. W.  On January 23, 2019, she ordered Darko to take meeting notes.  Markel Decl.

Exhibit Y (directing Darko to take notes).  Such a command to a non-supervisory colleague is

likely not a request for accommodations at all,[14] but even if it were, Darko took the notes and

sent them to Plaintiff after the meeting.   Markel Decl., Exhibit Z (Darko sending her the notes

from the meeting).  She asked the Bank for permission to attend an occupational therapy

appointment during work hours on February 1, 2019, and the Bank approved the request.  Markel

Decl., Ex. C, 305:9–17, 305:24–306:11.  Parker cannot salvage her claim by arguing that the

Bank failed to engage in an interactive process.  There was no need to engage in further process

where the Bank timely granted every request she made. *See Noll v. Int'l Bus. Machs. Corp.*, 787

---

job with accommodation and instead makes that element an affirmative defense to be proved by the employer. *See Romanello*, 998 N.E.2d at 1053.

[14]      *Cf. Tillman*, 118 F. Supp. 3d at 540 (granting summary judgment where plaintiff did not properly seek an accommodation).

F.3d 89, 98 (2d Cir. 2015) ("[T]he interactive process is not required when the end it is designed to serve—reasonable accommodation—has already been achieved.").

Because no reasonable jury could conclude that the Bank failed to provide reasonable accommodation, Defendant's motion for summary judgment on Plaintiff's claims of failure to accommodate under the NYSHRL and NYCHRL is granted.

## VII.   Defendant Is Entitled to Summary Judgment on Parker's NYCHRL Claim of Discrimination

The NYCHRL "creates a lower threshold for actionable conduct and must be construed liberally in favor of discrimination plaintiffs." *Cain v. Esthetique*, 182 F. Supp. 3d 54, 71 (S.D.N.Y. 2016), *aff'd*, 733 F. App'x 8 (2d Cir. 2018).  For this claim, the standard does not require but-for causation; instead, plaintiffs need only show that their disability played *some* role in their termination.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 & n.8 (2d Cir. 2013) ("[T]he plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.").  An employer is entitled to summary judgment "only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Id.* (emphasis in original) (citing *Williams v. N.Y.C. Hous. Auth.,* 872 N.Y.S.2d 27, 38, 40 n. 27 (1st Dep't 2009)).

Even applying this lower standard, no reasonable jury could conclude that Parker's termination — which occurred during her probationary period and followed demonstrable and contemporaneously-documented performance failures — was motivated even in part by discrimination.  As described above in Section III, Parker's best evidence is an email, in which Parker told Darko to take notes at a meeting, that Sheikh forwarded to Human Resources. Goodell Decl., Ex. 25.  In the email chain, Parker sent Sheikh "proof" that she could not perform certain tasks because of her "hand injury."  *Id.*  Sheikh forwarded the email to Human Resources,

writing: "[l]et's discuss this when you get a chance," about two hours before sending his memo recommending Parker's termination. *See id.*; *see also* Markel Decl., Ex. M. The email, viewed in context with the rest of the record and in the light most favorable to the Plaintiff, still does not create a triable issue of fact as to whether her disability played some role in her termination. The email includes neither explicit statements nor implicit suggestions that Sheikh considered Parker's finger injury in his decision to terminate her. All it evinces is that Sheikh wanted to discuss Parker's imperious email with Human Resources, which is not discriminatory.

Because all of the evidence in this case shows that the Bank fired a probationary employee for repeated performance failures, no reasonable jury could conclude otherwise.

## CONCLUSION

For the foregoing reason, Defendants' motion for summary judgment is GRANTED in full. The Clerk of Court is respectfully directed to terminate docket entry 68 and to close the case.

**SO ORDERED.**

Date:  **February 6, 2024**                                   **VALERIE CAPRONI**
          **New York, New York**                            **United States District Judge**